KALAMAZOO OIL CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kalamazoo Oil Co. v. Commissioner
Docket No. 8405-79.
United States Tax Court
T.C. Memo 1981-344; 1981 Tax Ct. Memo LEXIS 402; 42 T.C.M. (CCH) 304; T.C.M. (RIA) 81344; July 1, 1981
Benjamin W. Wise, for the petitioner. William F. Garrow, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies of $ 1,540 and $ 3,092 in petitioner's Federal income taxes for 1975 and 1976, respectively. Due to concessions by petitioner, the sole issue for decision is whether petitioner is entitled to deduct, as an ordinary business expense, payments purportedly made as consideration for a covenant not to compete. FINDINGS OF FACT At the time of filing its petition, petitioner Kalamazoo Oil Company's principal place of business was located in Kalamazoo, Michigan. Petitioner filed its Federal Income tax returns for 1975 and 1976 with the Internal Revenue Service Center, Cincinnati, Ohio. During the years in issue, petitioner *403 reported its income on the accrual method of accounting. Petitioner was incorporated under the laws of Michigan in 1955. Since its incorporation, petitioner has been engaged in the business of selling gasoline, fuel oil, motor oil, and other petroleum products at the wholesale and retail levels. Fall and winter sales of heating oil constituted a large proportion of petitioner's business. Immediately after petitioner's incorporation, the shareholders of petitioner were Marinus OnderLinde (Marinus), Bernard Sonnevil (Bernard), and Edward OnderLinde (Edward). Each shareholder owned 8,035 shares, or one-third of petitioner's total issued and outstanding stock. The stock consisted solely of common stock with one vote attached to each share. On June 13, 1962, Edward sold his shares of stock to petitioner for $ 40,000. After that date, Marinus and Bernard each owned 50 percent of petitioner's outstanding stock. Marinus and Bernard divided the labor so that Bernard was primarily involved with administrative work and Marinus was primarily involved in maintenance and deliveries. Subsequently, Marinus and Bernard purchased insurance individually to cover each other in the event *404 the other died first. The purpose of the insurance was to provide funds, upon the death of one of them, to buy the stock of the deceased shareholder. During 1973, Bernard and Marinus sold the policies to petitioner, receiving as consideration notes payable in the amount of the then cash surrender value of the policies. On February 20, 1974, Bernard and Marinus transferred their stock to petitioner and in exchange received the certificates issued as follows: Certificate
Shares
Person to Whom Issued
10
8,035
Bernard Sonnevil, Trustee
of the Bernard Sonnevil
Trust dated 2/20/74
11
8,035
Marinus OnderLinde, Trustee
of the Marinus OnderLinde
Trust dated 2/20/74
The Marinus OnderLinde Trust is a revocable intervivos trust entitling the grantor to income or principal in the discretion of the trustee. On the same date, a Stock Redemption Agreement was entered into by Bernard, Marinus, and petitioner. That agreement provided, interalia, that the shareholders could not transfer any stock without first offering the stock to petitioner. The agreement obligated petitioner to purchase all stock owned by a shareholder (or his estate or trust) *405 at the shareholder's death for the net book value of the stock plus a pro rata share of petitioner's profits for the 3 years preceding the shareholder's death. The agreement stated that the life insurance policies previously transferred to petitioner were general assets of petitioner. Petitioner was obligated to pay the premiums on the policies, and the proceeds of the policies were to be applied towards the purchase price of the stock of the deceased shareholder. To the extent that the purchase price of the stock being redeemed exceeded the amount of proceeds, petitioner would issue a negotiable promissory note. On February 17, 1975, the articles of incorporation of petitioner were amended as follows: ARTICLE V
The total authorized capital stock is: (1) Class A common shares 25,000 shares; par value $ 1.00 per share. (2) Class B common shares 25,000 shares; par value $ 1.00 per share. (3) A statement of all or any of the relative rights, preferences, and limitations of the shares of each class is as follows: All classes of shares shall have identical rights, preferences, and limitations except that Class A common shares shall be entitled to vote on all matters *406 involving this Corporation; but Class B common shares shall not be entitled to vote for Directors nor for any other matters involving this Corporation, except as required by law. On February 28, 1975, the prior stock redemption agreement was cancelled and petitioner and Marinus entered into a new stock redemption agreement. Under the February 28, 1975, stock redemption agreement, Marinus was required to exchange all of his stock, which carried voting rights, for 8,035 shares of nonvoting class B stock. The agreement further provided that Marinus, individually and as trustee, would then sell all of the class B stock to petitioner for $ 100,000 pursuant to a schedule specified in the agreement. The agreement granted an option to petitioner to buy, and to Marinus to sell, 5 percent per year of Marinus' stockholdings at a price of $ 12.44555 per share until petitioner had purchased 25 percent of the stock. The balance of Marinus' stock was to be sold to petitioner at his death at the same price per share. Petitioner also was obligated to continue to pay the premiums on life insurance policies on Marinus. The proceeds of $ 75,000 from the policies were to be used as a downpayment *407 toward the purchase price of the stock still held by Marinus at his death. Finally, the agreement stated that in consideration of the payment by petitioner to Marinus of $ 7,000 per year for the remainder of Marinus' life, Marinus would not compete with petitioner in Kalamazoo County for the rest of his life. At the date of the agreement, Marinus was 64 years of age. Due to his age, he planned to permanently retire, and did not intend to compete with petitioner. Immediately after his retirement, Marinus went to Florida on a temporary basis. Every year since, Marinus has spent the winter in Florida. Petitioner claimed a deduction of $ 7,000 as an ordinary business expense as payments for a covenant not to compete. Respondent disallowed the claimed deduction. Respondent determined that the payments were not deductible as an ordinary business expense but rather constituted dividends or payments made as part of a capital transaction. OPINION Petitioner contends that the $ 7,000 annual payments were payments for a legitimate covenant not to compete and thus are deductible as ordinary and necessary business expenses under section 162. [1] Respondent, to the contrary, maintains *408 that petitioner has not shown that the purported payments for the covenant not to compete were a necessary expense of petitioner's business. We agree with respondent. When Marinus retired from the business, he did not sever his interest in petitioner. Rather, he merely exchanged his voting stock for nonvoting stock, and retained a 50-percent equity interest in the corporation. [2] Although petitioner could acquire 5 percent of Marinus' stock each year for 5 years, the February 1975 agreement contemplated that Marinus would continue to own, until his death at least 75 percent of his stock in petitioner. Thus, Marinus continued to have an interest in the financial success of petitioner, and the practical effect of the noncompetition agreement was merely to restrict Marinus from competing with himself. See , affd. per curiam . In order for Marinus to receive the $ 100,000 sale price, any dividends which might be declared on his stock, *409 payment of not note given for the cash value of the transferred life insurance policy, and the $ 7,000 per year lifetime payment, petitioner had to continue as a viable business enterprise. With such a continuing stake in petitioner's financial well-being, it would not have been to Marinus' advantage to compete with petitioner and thereby reduce its profits. Furthermore, petitioner has failed to show why a covenant for the remainder of Marinus' life was necessary to protect petitioner's business. The covenant was not linked to Marinus' physical or mental capability to compete. There is no evidence to indicate that Marinus posed any real competitive threat to petitioner. The term of the covenant, and in particular the fixed annual payment covering Marinus' entire remaining life, extended far beyond the time period when he might have been expected to compete with petitioner if he had the capability or inclination to do so. In addition, other *410 factors cast doubt upon the reality of the purported covenant. The record clearly shows that Marinus, who was nearly 65, intended to permanently retire as soon as he left petitioner's employment. He did not intend to compete with petitioner. Indeed, following his retirement, Marinus spent every winter, the busiest business period for petitioner, in Florida. The record also reflects that in the course of the negotiations the payment for the covenant not to compete was suggested by petitioner's attorney. In the light of all the evidence, including the various redemption arrangements in effect for several years, as described in our findings, we think the most reasonable inference is that the covenant was merely a paper promise designed to provide petitioner with deductions for part of the cost of purchasing Marinus' stock. Finally, we note that Marinus exchanged his voting stock for nonvoting stock without receiving any compensation for the voting rights. The record indicates that the agreement to pay Marinus an annual payment of $ 7,000 was written at the same time the parties entered into the stock exchange agreement. Thus, under these circumstances, we think it likely that *411 the $ 7,000 payments were not for a bona fide covenant not to compete but were, at least in part, consideration for Marinus' stock voting rights. Nonetheless, we need not make a determination as to what the $ 7,000 payment was for, as that issue is not before us. We merely hold that the annual $ 7,000 payments purportedly made for the covenant not to compete were not ordinary and necessary business expenses. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
2. As reflected in our findings, Marinus, on Feb. 20, 1974, placed his stock in a trust. However, the trust was revocable and Marinus could, therefore, recover the stock at any time. The stock is thus treated as belonging to Marinus.↩